year. In the one case, as well as in the other, when the act complained of was done, it was innocent, but a statute, subsequently passed, makes it penal. And if punishment in the one case can be inflicted, it may be in the other. The only difference is in time, not in principle.

A rule of construction which leads to such a result, cannot be a sound one. Like many technicalities which have grown out of judicial action, the fiction is sustained neither by justice nor reason. So far as relates to crime, the only reasonable and just rule of construction would be, that until after its promulgation the law cannot take effect. Any thing short of this might well be compared to the edicts of the Roman emperor, who elevated them so high that the people could not read them. Indeed, our modern legislation would be more cruel, unjust, and revolting. By great effort, possibly, the edicts might have been read, but no human effort can read that which belongs to the future, and which depends upon contingencies. But after the law is passed, who can have notice of it until it shall be published.

Remedial laws are not objectionable on this ground. They only remove a technical objection, and give effect to a bona fide transaction, as was the intention of the parties. But to all other legislation affecting personal rights, the objection holds. In the case of Pugh v. Duke of Leeds, Cowp. 714, there was much discussion whether the words in a lease, "to commence from the day of the date," meant inclusive or exclusive of the day it bore date. Lord Mansfield, after a laborious discussion, overruled his former decisions, and came to the conclusion that the words might be construed to include or exclude the day of the date, as from the context might appear to have been the intention of the parties. In that case, as the validity of the lease depended upon its taking effect on the day of its date, and as the court presumed it was the intention of the parties to make a valid lease, they held that the lease took effect on the day it was dated. But prior to that decision the general view had been, that "from the day of the date," in an instrument, excluded the day of the date.

All who are acquainted with the history of legislative action in congress know that bills passed on the 3d of March, in what is called the short session, are signed by the president late in the evening of that day, and are not published until some days afterwards. But the repealing act in question provides, "that it shall not affect any case or proceeding in bankruptcy commenced before the passage of that act." Now suppose by a fiction the repealing law would take effect so as to include that day; still the saving goes to the passage of the act, and not to the time it took effect. Where the computation of time in a statute is to be from an act done, the first day should be excluded. Ex parte Dean, 2 Cow. 605, 606; Homan v. Liswell, 6 Cow. 659. But this cannot be considered an original application for the benefit of the act. The petitioner having been declared a bankrupt on the 3d of March, 1842, he applied for his discharge. This is a proceeding depending upon the procedure of his creditors and inseparably connected with it. In fact and in law, it must be considered as a continuation of the former proceeding. In this view no doubt can be entertained, as the petitioner was declared a bankrupt before the repeal of the bankrupt law.

There is nothing in this application to prevent the court from giving a liberal construction of the saving in the repealing act, with the view of carrying out the remedial provisions of the bankrupt law. Upon the whole, I think the petition for the discharge, filed the 3d of March, 1843, was within the statute, as the decree of bankruptcy against the petitioner, in the form presented, constitutes a part of those proceedings; and that, consequently, the district court has jurisdiction of the petition, and may act upon it as the law authorizes. This opinion may be certified to the district court.

[NOTE. The supreme court of Vermont held that a petition filed March 3, 1843, was too late. In re Welman, 20 Vt. 653; In re Howes, 21 Vt. 619. Contra, see The Ann, Case No. 397.]

## Case No. 396.

### The ANN.

[Blatchf. Prize Cas. 242.][1]

District Court, S. D. New York. Oct., 1862.

PRIZE—VIOLATION OF BLOCKADE.

Vessel and cargo condemned for a violation of the blockade. Spoliation of papers by the master. Part of the cargo contraband of war.

In admiralty.

BETTS, District Judge. This vessel and cargo were captured by the United States naval forces stationed off Mobile, Alabama, June 29, 1862, and were sent thence to this port for adjudication. A libel was filed against them July 17 thereafter, and, on the 9th of September, the owners, British subjects, residents in England, intervened, by their agent, and claimed the vessel and cargo as neutral property, contesting the legality of the seizure, and denying that Mobile was a blockaded port, or that they had lawful warning of such fact. On the hearing of the cause in court, counsel for the claimants appeared and contested the condemnation upon the law and facts of the case.

The substance of the case, on the preparatory proofs, is, that the vessel was fitted out in England, with a cargo consisting in part, of articles contraband of war, and that her destination was to ports in the West Indies,

[1][Reported by Samuel Blatchford, Esq.]

and from the last one, Havana, to Mobile, and thence back to England. The war between the United States and the rebel states, and the blockade of the southern ports, were well known in England when the vessel was fitted out and despatched. On her arrival at Havana it was reported that the blockade at New Orleans and Mobile had been raised by the United States. The report was not credited on the vessel, and it was determined to run her into Mobile. She attempted to make the entry secretly and covertly. When the blockading vessels lying off the port were discovered, the master destroyed his bills of lading, his private accounts, and the ship's entries.

The vessel was run in past the blockading fleet and Fort Morgan, and was there attacked by the United States forces and captured. She was anchored, and was unlading, when she was first attacked, and worked herself further in the harbor, but, being unable to get out of the reach of the attacking force, was abandoned by the master, the supercargo, and most of the crew, who went to Charleston. The master and two engineers embarked from Charleston for England in the steamer Memphis, and, on getting out of Charleston, that vessel also was captured and sent into this port. These officers were examined as witnesses in this suit, in preparatorio, on the arrival of the Memphis at New York. They made a clear and unreserved disclosure of the facts above recapitulated.

The case is free from all ambiguity. The voyage undertaken in England was with full knowledge that Mobile was under blockade. The vessel was, notwithstanding, despatched with her cargo, of which a valuable part was contraband of war, to convey it to the use of the enemy, and make her return directly to the owners in England. A decree of condemnation and forfeiture of the vessel and cargo is ordered to be entered.

---

## Case No. 397.

### The ANN.

[1 Gall. 62.][1]

Circuit Court, D. Massachusetts.     May Term, 1812.

INTERNATIONAL LAW — JURISDICTION OVER TIDE WATERS — EMBARGO ACT—CONSTITUTIONAL LAW —WHEN STATUTES TAKE EFFECT.

1. Every nation has exclusive jurisdiction over the waters adjacent to its shores, to the distance of a cannon shot or marine league.
   [Cited in U. S. v. New Bedford Bridge, Case No. 15,867.]
   [See 1 Whart. Int. Law, § 32; Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559.]

2. A departure from any place within the jurisdictional limits of the United States, although such place be not within any port, is within the provisions of the embargo act of 22d December, 1807, [2 Stat. 451,] c. 5.
   [See note at end of case.]

3. Where no other time is fixed for the operation of a penal statute, it takes effect from the time of its passage; and ignorance of the existence of such act forms no legal excuse for a violation of it.
   [Cited in U. S. v. Arnold, Case No. 14,469; Smith v. Draper, Id. 13,037; Lapeyre v. U. S., 17 Wall. (84 U. S.) 197; U. S. v. Chong Sam, 47 Fed. 883.]
   [See note at end of case.]

[Appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. The brigantine Ann was seized by the collector of the port of Newburyport, and libelled in the district court, for that said brig, on the 12th day of January, 1808, departed from said port and from the limits and jurisdiction of the United States, and proceeded on a foreign voyage, to wit, to the island of Jamaica, in the West Indies, contrary to the act of the 9th of January, 1808, c. 8, [2 Stat. 453.] It appeared that the Ann sailed from Alexandria, in the District of Columbia, with a cargo of flour, on the 22d day of December, 1807, bound for Newburyport. On the 31st of December, the brig arrived at Martha's Vineyard, where the captain and crew heard of the embargo. On the 12th of January, 1808, the brig arrived off the port of Newburyport, and anchored between two and three miles from Newburyport bar, (which is the limit of the port of Newburyport,) and about the same distance from the neighboring land. A part of the crew were here discharged, and a new crew [obtained] in their stead, and also a supercargo came on board. After taking in some provisions, and stores, and water, the brig sailed on the 13th of January for Jamaica, where she arrived in about 27 days, landed and sold her cargo, and returned to the United States with a cargo of rum; and was afterwards seized. It also appeared that [Isaac] Tenny, one of the claimants, had full notice of the transactions while the Ann lay off Newburyport, and assisted or at least assented thereto. [Affirmed.]

G. Blake, for the United States.
S. Dexter, for claimant.

[Before STORY, Circuit Justice, and DAVIS, District Judge.]

STORY, Circuit Justice. As the Ann arrived off Newburyport, and within three miles of the shore, it is clear that she was within the acknowledged jurisdiction of the United States. All the writers upon public law agree that every nation has exclusive jurisdiction to the distance of a cannon shot, or marine league, over the waters adjacent to its shores. (Bynk. Qu. Pub. Juris. 61; 1 Azuni, [Mar. Law,] 204, § 15; Id. p. 185, § 4;) and this doctrine has been recognized by the supreme court of the United States. [Church v. Hubbart,] 2 Cranch, [6 U. S.] 187, 231. Indeed

---

[1][Reported by John Gallison, Esq.]